**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**Steven L. KENNEDY, Defendant.**

**Civil Action No. H–06–1980.**

United States District Court,
S.D. Texas,
Houston Division.

March 17, 2008.

Eliseo Noel Padilla, James E. Elliott, Susan Elizabeth Arthur, Federal Trade Commission, Dallas, TX, for Plaintiff.

Jonathan D. Baughman, Miginnis Lochridge et al., Michelle Rebecca Moore, Alton J. Hall, Jr., Epstein Becker et al., Elias Mark, Baker & McKenzie, John L. Grayson, Grayson & Hovemkamp, Houston, TX, Joseph D. Wargo, Wargo French LLP, Adam S. Katz, Kelly Amanda Lee, Robert R. Ambler, Jr., Womble Carlyle Sandridge and Rice, Atlanta, GA, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

KENNETH M. HOYT, District Judge.

## I. INTRODUCTION

The Federal Trade Commission ("FTC") the plaintiff, filed this suit against Websource Media LLC ("WSM"), Websource Media, L.P. ("WSM LP"), BizSitePro, LLC ("BSP"), Eversites, LLC ("Eversites"), Telsource Solutions, Inc. ("TSS") and Telsource International ("TSI") as defendants. In addition, the FTC named as defendants six individuals: Steven L. Kennedy, Marc R. Smith, Kathleen A. Smalley, Keith Hendrick, John O. Ring and James

E. McCubbin, Jr.[1] This suit was brought pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. §§ 53(b) and 45(a) and 5(a) ("the Act"). The Court received testimonial and documentary evidence concerning the conduct of the defendants, and particularly Steven L. Kennedy, and determines that the FTC should prevail on its claims.

## II. FACTUAL BACKGROUND

The evidence is substantial and shows that Smith formed NetStrategy, Inc., as a holding company in 1997 for the purpose of engaging in the telemarketing business. Shortly thereafter, WSM was formed and Kennedy was elected president of WSM. He served as president, one of its managers and as a member (owner) of WSM until he resigned on or about September 7, 2001. However, Kennedy continued as a member of the management team of WSM, and served as vice-president of both NetStrategy, the holding company. He also held an office with Globenetics, a subsidiary of WSM.

Under Kennedy's presidency, WSM engaged in selling website designs and hosting services from 1997 to 1999, when it discontinued the sales side of its telemarketing business. However, it maintained its customer base; and in 2002, the principals Smith, Smalley, Hendrick and Kennedy decided to "relaunch" their telemarketing business utilizing a number of corporations and outside contract services. BizSitePro, Eversites, TSS and TSI were the primary entities that transacted business in Texas. The testimony and documents show that Kennedy was active in the relaunch of

WSM. He also had frequent communications with the billing aggregators who handled WSM's accounts. As early as 2001 and continuing, Kennedy communicated with WSM personnel concerning complaints made by consumers concerning unauthorized billings to their telephone accounts. After a period, the telephone billing complaints came to the attention of the FTC.

Also in 2001, WSM sold its existing accounts to WebExcites, a company owned by McCubbin. McCubbin had served as a sales representative for Smith, when Smith owned Equalnet, an unrelated company. After the 2001 sale, WSM relaunched its operations under the product name "WebPointUSA"[2]. In the same time frame, Ring and McCubbin incorporated TSI and TII to provide telemarketing services through domestic and international call centers particularly for WSM and its entities. In this regard, TSI and TII contracted with WSM to provide telemarketing services to WebPointUSA, BSP and Eversites. Even though BSP and Eversites were not "owned" by WSM or Kennedy, the evidence shows that he contracted and paid for the private mailbox that BSP used as its business address. He also completed a form entitled, "USPS Application for Delivery of Mail Through An Agent" for BSP's private mailbox. Kennedy performed a similar service for Eversites and U.S. Web Network ("USWN"). Hence, BSP, Eversites and USWN were created in order that WSM could continue billing its customers through Local Exchange Carriers ("LECs") when the LECs refused to accept further billing requests from TSS and TSI.[3]

---

**1.** The defendants, WSM, BSP, Eversites, WSM LP, TSI, TSS, Marc R. Smith, Kathleen A. Smalley, Keith Hendrick, John O. Ring, and James E. McCubbin have reached settlement with the FTC and; therefore, are no longer parties to this suit.

**2.** *See* FTC Exhibit 15 which shows that Kennedy had access to Web Point USA's Call Center.

**3.** The LECs included Bell South, Southwestern Bell (SWB), Sprint and other local exchanges or regional telephone services. Bell

Eventually, USWN was purchased by WSM and WSM products were sold under the product name USWN. In May of 2006, WSM was sold to Web.Com, Incorporated. WSM LP survived the sale and continued to sell WebPoint USA, BSP and Eversites products in behalf of Web.Com. WSM LP was operated by Kennedy, Smith, Smalley and Hendrick, the same management team that was in place before the sale. An injunction was entered against the defendants and Web.Com, Inc., in June of 2006.

## III. THE SUIT AND PARTY CONTENTIONS

### A. *The FTC's Claims and Contentions*

The FTC filed this suit against the defendants in June of 2006, in connection with the marketing and sale practices associated with WSM's website services. The FTC claims that the defendants and WSM engaged in a practice called cramming, or web cramming, in violation of Section 5 of the Act. Cramming is a practice by which the telemarketer bills a consumer for a product or service without first obtaining the consumer's informed consent, a practice prohibited by the Act. Hence, it was the script and the salespersons' departures from the script that came to the attention of the LECs and, eventually, the FTC. The FTC also contends that Kennedy, through the various entities, participated with others in controlling the marketing and billing activities of the various entities through a common enterprise. The FTC asserts that through this common enterprise, Kennedy repeatedly violated the Act by engaging in unfair and deceptive acts and practices.

Specifically, the FTC charges that all defendants engaged in unfair acts and practices by charging consumers' tele-

phone accounts without previously obtaining the consumers' informed consent. Secondly, the FTC alleges that they falsely represented that if a consumer agreed to a free trial website, the website would be cancelled automatically after a trial period unless the consumer approved the website. In fact, the FTC charges, the website was not automatically cancelled, yet the consumers' telephone accounts were charged a fee. The website service charged an initial setup fee of $49.99 and a monthly charge of an additional $49.99 per month. Prior to April 9, 2004, WSM sold websites under the trade name WebPoints USA and the fees were $39.99 per month. It is the FTC's contentions that Kennedy and others caused consumers telephone accounts to be billed without having previously obtained the consumers' express informed consent and by misrepresenting the cancellation procedure.

The FTC also contends that the defendants and WSM provided their telemarketers basic scripts for cold calling potential customers. Nevertheless, the telemarketers often crafted personalized scripts, similar to the following, in order to consummate a sale:

> This is _____ calling from EverSites. How are you doing? The purpose of my call is I'm sending over some information on a website offer for your business . . .
>
> Can I fax it or mail it out?
>
> Who would I direct it too? Is he/she the Owner or the Manager? And who am I speaking with?
>
> This will arrive in a few days and it can be reviewed it [sic] at that time. It will include a pass code that allows them to go in and look at the site. If a decision is made to purchase the website it is

South, SWB and Sprint notified WSM that WSM had repeatedly exceeded the threshold of complaints and as a result WSM lost billing

privileges. As a result, new companies were formed through which WSM continued billing consumer accounts.

only $49.99 per month, *but there is no cost or obligation by looking it over.* [emphasis supplied]

Now can you grab a pen for me, please?

Now I will give you a five-digit confirmation number, that's going to remove your business from the computer so my co-workers won't keep calling you repeatedly about the offer, OK?

We use an automated system that will verify four quick questions: First name, Last name, Company's name, Address—that's it. The last question is basically—are you over 18 and authorized to make decisions? I know that's a strange question, but the reason we ask that is because it involves the Internet and we're not allowed to send anything to a minor.

So give a clear yes and then you will receive the reference number and I'll write it down in case you missed it. Do you have any questions for me?

Remember your [sic] not buying anything today and your phone number is XXX–XXX–XXXX, right?

Ok, hold on one second while I connect us, and thank you for your patience!

Once the telemarketer received what the telemarketer considered a "yes" to the necessary question(s) the appropriate answers were recorded. Often, the questions and answers were repeated in order to craft the recording. These recorded verifications were received by third-party entities such as Voice Log and iVoice Record who provided a dial-in automated system to record the consumer's answers to scripted questions. Before the call ended, the telemarketer was to transfer the customer to the automated system to create a Third Party Verification ("TPV"). However, while the TPV was being recorded, the telemarketer would often remain on the phone line and coached the customer through the verification process. The following is an example of the TPV's automated questions:

Sir/Ma'am? I'm entering your phone number, Ok?

Ok, the next four questions are for you and I'll push the buttons to speed it up. I'm not going anywhere, I'll be right here.

You have reached EverSites' automated verification system and this call is being recorded to confirm your understanding of our offer. Let's begin ...

I need to know who I am speaking with, please say your first and last name?

What's the name of your company?

Thank you for agreeing to try a website from EverSites. Your new Website will be activated within 24 hours and is free for 15 days. You will incur no charges at this time, but if you decide to keep the Website, there will be a one-time setup fee of $49.99. *You may cancel at any time, by simply calling our toll free customer support line at 866–558–7483.*

Can you please clearly say your company's mailing address including the city, state and zip code?

What's your fax number? If you don't have one, just say "none".

Tell me your email address and please spell it for accuracy. If you don't have one, just say "none".

Can you please tell me your main telephone number?

EverSite is not affiliated with your phone company. However, if you keep your site, the charges will appear on your local telephone bill. Are you authorized to incur charges on this telephone account and are you at least 18 years of age?

That's all the information that I need. Congratulations on your site and welcome to EverSites. If you have any questions, you may reach us toll free at 866–558–7483.

Your confirmation number is ... [GET NUMBER].

After a TPV was created the defendants and WSM would place a charge for a set-up fee on the consumer's telephone bill in spite of their representations to the contrary. And, unless the consumer called in to cancel the service, a monthly hosting fee would be automatically charged to the consumer's account each month thereafter.

### B. The Defendant's Claims and Contentions

Kennedy contends that he is not personally liable for any alleged fraud and, if any such liability exists, it rests on WSM, the only company with which he had any association. In this regard, Kennedy denies any association with TSS, TSI, WSM LP, BSP, Eversites and other created entities. Kennedy also charges that, even if the FTC proves that WSM engaged in fraud, the FTC must also establish that he either directly participated in the fraud or had the ability to control the activities of the entity(s) committing the fraud. Finally, he argues that even if the FTC were to prove fraudulent conduct on the part of WSM and that he controlled the entity, the FTC must also establish that he knew or should have known of WSM's deceptive practices. Kennedy's final contention is that the TPV(s) prove that the consumer accepted the free trial offer. Therefore, it was proper for WSM to proceed after obtaining the TPV as though the sale had been properly completed.

### IV. DISCUSSION AND ANALYSIS

The FTC brought this case pursuant to Section 5(a) and 13(b) of the Act, 15 U.S.C. §§ 45(a) and 53(b). Section 45(a) prohibits unfair methods of competing in Interstate Commerce. Specifically, the statute reads: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." See [§ 45(a)(1) ]. Section 53 permits the FTC to seek and obtain injunctions against persons and entities who violate any provision of the Act. Likewise, 13(b) authorizes the FTC to seek and obtain temporary restraining orders and preliminary injunctions for violations or threatened violations of the Act.

■ The FTC contends that Kennedy and others under their control unfairly caused unauthorized charges to be billed on the telephone service of individuals and businesses, particularly small businesses and non-profit organizations. This practice, it argues, violated the Act. To establish this contention, the FTC must establish that Kennedy engaged in a practice that was likely to cause substantial injury to consumers; that the injury was not reasonably avoidable by the consumers; and, that the injury suffered was not outweighed by countervailing benefits to consumers or the competition. *See Orkin Exterminating Co. v. FTC,* 849 F.2d 1354, 1363–66 (11th Cir.1988).

### A. Practice Likely Caused Injury

The first element of the burden of proof requires the FTC to prove that numerous consumers' telephone bills reflected billings for services that they did not want. Kennedy denies that the FTC has proven this element against him. He contends that he resigned as manager and president of WSM in September of 2001. Afterward, WSM was managed by Smith and Smalley. And, although he remained an employee of WSM and held an interest, he contends that he played no role in marketing and selling of website products. Instead, he contends that he was responsible for marketing and selling a product called Globenetix, unrelated to WSM's website business.

As well, Kennedy asserts, he was never a manager, member, officer, director or

employee of BSP, TSS, or TSI. As such, he did not participate in or have authority to control the business practices of those entities, Smith, Smalley, Hendrick or the telemarketing activities of WSM's subsidiaries. It was Smith, Smalley and Hendrick, he contends, who negotiated the telemarketing agreements; managed, supervised, trained, employed and terminated the services of the telemarketing companies and their employees. Finally, Kennedy points out that WSM required that scripts used be used and that the scripts were lawful. After a sale, each new customer received a "Welcome Letter" confirming the transaction. As well, quality control personnel were hired to police the telemarketers' activities. When violations of WSM's protocols were detected and verified, penalties were assessed against sales representatives and they were subject to termination.

The facts show otherwise. In spite of the WSM protocols, the sales representatives charged consumers for the website setup fee even though the consumers were told that they would not be billed during the trial period. Nor were customers warned of the "negative option" built into the telephone script—the practice of requiring the consumer to call back and cancel a service that was allegedly free for 15 days. Instead, WSM required the consumer to contact WSM during the trial period to effect a cancellation in spite of its "no cost" representation. This practice shifted the burden to the consumer.

The evidence also shows that consumers were in fact billed immediately or shortly after the sale and that the "Welcome Letter" may not issue and, when it did, was not always timely[4]. In innumerable in-

stances, the consumers were billed for the monthly service unaware that there was in fact, no trial period. When consumers requested refunds, they did not immediately receive them. Tens of thousands of consumers never obtained refunds. Therefore, as to the first element, injury to consumers for services that they did not subscribe, the Court is of the OPINION, and FINDS, that the element is proved by a preponderance of the evidence.

### B. Consumer Could Not Avoid Injury

Next, the FTC contends that consumers were not given a true "free and informed choice that would enable them to avoid the unfair practice." Kennedy contends that WSM adopted policies that complied with the FTC's telemarketing guidelines. In addition to the guidelines, he asserts, WSM required TSS and TSI to adopt and implement a practice to insure compliance. Specifically, supervisors walked the sales floor and monitored calls for noncompliant conduct on the part of sales representatives. In addition, quality control representatives would check sales recordings daily, supervisors would listen to each TPV before sending it to WSM and, where noncompliance was detected, cancellation, fines and termination followed.

The evidence shows that, in spite of the scripts and guidelines, consumers were intentionally misled. They were told that the website was "free" and that no charge or obligation was attached. Others refused the service and, yet, their telephone bills reflected a charge for a setup fee and later monthly billings[5]. In other instances, the person allegedly authorized to obligate the entity, was a minor or otherwise lacked the authority to commit the entity[6].

---

4. *See* FTC Exhibits 317, 319, 320, 324, 326, 327, 331 and 340.

5. *See* FTC Exhibits 312 through 316, 324, 325, 328, 331, 333 and 340.

6. *See* FTC Exhibits 314, 318, 326, 327, 328, 329, 331, 332, 334, 336, 337, 340, 341, 342, and 343.

Nevertheless, sales representatives processed the transaction based on false representations. As a result of these findings, the Court CONCLUDES that the second element, that the consumer could not have reasonably avoided the injury caused by Kennedy's conduct, is established by a preponderance of the evidence.

### C. Does Injury Outweigh Benefits

Lastly, the FTC contends that the injury suffered by the consumer was not outweighed by benefits to the consumer or to the competition. Kennedy argues that the FTC has failed to present evidence of damages. He points to the Temporary Receiver's 2004 to 2006 Report as the relevant period of time for consideration consumer injury and damages in this case. In that Report, according to Kennedy, the percentage of alleged unauthorized sales dropped from 33.75% in 2004 to 16.41% in 2006. However, this response does not address whether the consumer's injury was outweighed by the benefit he received or the benefit to the competition.

The evidence shows that numerous consumers were billed for a service that they did not want an in fact had refused[7]. Therefore, consumers were forced to pay for a service that they never requested. Moreover, consumers were forced to expend substantial time and effort to obtain refunds and cancellation of the service. In spite of their efforts, all consumers have not received a full refund. Finally, there is no evidence that consumers benefit from the service outweighed their injuries. Equally, there is no evidence that the benefit to the competition in the telemarketing arena outweighed the consumer's injuries. The Court CONCLUDES that the injuries caused to consumers were not outweighed by benefits to consumers. Therefore, the FTC has established this element by a preponderance of the evidence.

By establishing these elements, the FTC has demonstrated that Kennedy engaged in unfair practices in violation of Section 5 of the Act. Kennedy accomplished this practice by causing or permitting consumers telephone bills to be charged without previously obtaining their informed consent. Therefore, Kennedy violated the Act by submitting unauthorized charges on consumers' telephone bills.

## V. FALSE REPRESENTATIONS TO CONSUMERS

■ The FTC also contends that Kennedy violated § 5 of the Act by falsely representing that if a consumer agreed to a "free" trial offer, the website would be cancelled automatically if the consumer did not approve of the website during the trial period. Again, Kennedy relies on the argument that his relationship with WSM was at best tangential. He contends that he was not an officer or member of WSM management although he was an employee and holder of a minority interest.

The evidence shows that even though Kennedy resigned as president and manager of WSM in 2001, he continued as a manager of WSM. He was an officer of WSM's parent company, NetStrategy, and he was president of Globenetics, a subsidiary of WSM. Hence, the Court concludes that, while Kennedy resigned from WSM, he maintained a control position directly with WSM and indirectly through the parent corporation. More importantly, he remained in the management "loop" of WSM even though documents did not always reflect that he held an office.

The Court is of the opinion that Kennedy engaged in deceptive acts and practices in violation of § 5(a) of the Act. Kennedy accomplished their deceptions when WSM management made a "material" misrepre-

---

7. See, for example, FTC Exhibits 311 through 343.

sentation that was likely to and, in fact, did mislead consumers concerning the obligations that came with a "so-called free" WSM website. A misrepresentation or omission is material when it is likely to affect the consumer's decision to act. *See Carroll v. Jordan Ashley, Inc.,* 101 F.3d 707 (11th Cir.1996). Kennedy's representations were not only misleading, they were false. The Court, therefore, concludes that Kennedy's representation, that the website was setup on a "trial basis" and that the site would automatically be cancelled if the consumer did not approve of it, was false and misleading. Kennedy knew how the scripts were being used [8]. As well, he had an obligation to know how his salary was being derived. Therefore, the Court is of the opinion that Kennedy engaged in deceptive acts and practices in violation of the Act.

## VI. THE FTC'S COMMON ENTERPRISE CLAIM

The FTC also asserts that the defendants, individuals and entities, engaged in a common enterprise when they charged consumer accounts without their informed consent, and by representing to consumers that the website was provided on a free trial offer basis, when in fact it was not.

Kennedy contends that no common enterprise existed. He asserts that TSS and TSI as telemarketing companies existed as separate entities apart from WSM. He argues that TSS and TSI had separate owners and directors apart from WSM. Further, he argues, TSS, TSI and WSM maintained separate books, had separate employees and payrolls and the like. As well, those responsible for directing and managing TSS and TSI had no authority or control over WSM and vice versa. Finally, he asserts, TSS and TSI did not share office space with WSM.

■ Companies participating in a common enterprise are jointly and severally liable for the injuries caused by their conduct. *See FTC v. Investment Developments, Inc.,* 1989 WL 62564, 1989 U.S. Dist. LEXIS 6502 at 29 (E.D.La., June 8, 1989). When the evidence shows that an individual, such as an officer, participates in fraudulent conduct in violation of the Act, that individual may be personally liable for a consumer's injuries. *See FTC v. World Media Brokers, Inc.,* 415 F.3d 758, 764 (7th Cir.2005). His knowledge may be actual or constructive; and, specific intent to defraud need not be proved. *See FTC v. Publ'g Clearing House,* 104 F.3d 1168, 1170–71 (9th Cir.1997). Either participation or authority to control with knowledge, is sufficient. *Id.*

In order to prove that the defendants acted as a common enterprise, the FTC must establish facts showing that there was a common control group, that business was transacted through a member of interrelated companies, commingling of corporate funds, unified advertising, and/or other facts that reveals that there was no real distinction exists between WSM, TSS, TSI and the other entities that ultimately reported to WSM. *See FTC v. AmeriDebt, Inc.,* 343 F.Supp.2d 451, 462 (D.Md.2004). It is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an "unholy" alliance. *Id.*

■ The evidence shows that the managers and principals of WSM, BSP, Eversites, WSM L.P., TSI and TSS were individuals Smith, Smalley, Hendrick, Kennedy, Ring and McCubbin. More specifically, Smith, Smalley, Hendrick and Kennedy were owners of WSM. Kennedy, in particular, served as an officer and

---

8. *See* FTC Exhibits 328, 333, 341 and 652.

manager of WSM and as president of one of its subsidiaries, Globenetics. Although Smith replaced Kennedy as president of WSM, Kennedy maintained a 17.8 percent interest in WSM and received salary and employee benefits from WSM, including back pay when WSM was sold to Web.Com, Incorporated. Finally, in evidence presented to the Court in 2005, Kennedy was listed as executive vice-president and co-founder of WSM. The Court takes this representation to mean that, while Kennedy did not hold a published office with WSM, he, nevertheless, was a corporate official and participated in management decisions.

The evidence also shows that Kennedy was involved in the LEC billing processes, particularly regarding documents that traveled between WSM and the billing aggregators. He was informed by Hendricks and others concerning the billing records. And, although he was not an officer or manager of EverSites or BSP, he authorized the establishment of their mailbox accounts. During his leadership of WSM before 2001, Kennedy was fully aware of accusations of fraudulent sales. And, in January and February 2003, he became aware that WSM had exceeded the threshold of consumer complaints and was facing cancellation of the LEC account. He advised that the FTC could hold the individuals liable for the sales representatives' conduct. As well, he knew that other entities were formed so that WSM could continue its billing practices. According to Smalley, Kennedy was fully aware of the scripts used and the customer service complaints while serving as one of the four managers of WSM. Also, he was WSM's technical support person, and for an indeterminate period of time, received consumer complaints through WSM's website. Kennedy, Smith, Smalley and Hendricks went on to take offices with WSM.com when WSM was purchased. The defendant served as vice-president of Web.Com.

Therefore, the Court need not determine whether the elements of a common enterprise were established by the FTC because the Court determines that Kennedy was an owner, officer and employee of WSM. He participated in WSM management decisions. While he did not directly manage TSS and TSI, the evidence shows that he was an undisclosed participant in their activities as management and ownership in WSM. Thus, he knew or should have known of the fraudulent activities of the sales representatives with whom WSM had entered into contract. As an officer and owner and a person in the "management loop" Kennedy had a duty to know and a responsibility to correct the fraudulent conduct of WSM, and through WSM, its subsidiaries or operatives. Hence, the Court FINDS and CONCLUDES that Kennedy had authority to control and did, in fact, control WSM and, through WSM, its subsidiaries and operatives.

## VII. RESTITUTION AND CONSUMER INJURY

Because Kennedy and the officers of WSM acted in concert to violate § 5(a) of the Act and 15 U.S.C. § 45(a), an appropriate remedy must be fashioned for Kennedy's unlawful conduct. Presently, an Agreed Permanent Injunction has been entered against all corporate entities and the individual defendants including Kennedy. He stands alone in this suit as the FTC seeks restitution for the consumers' injuries.

In this respect, Kennedy argues that the FTC relies on the Temporary Receiver's Final Report in calculating the amount of the consumers' harm for the periods 2002 through 2006. He asserts that these amounts should have been offset for the periods 2002 and 2003, periods that are irrelevant to this litigation and if considered, would reduce the alleged amount of

harm. Kennedy also points to the settlement proceeds of $1.2 million, received from six corporate defendants and five (5) individual defendants. Considering these sums, Kennedy asserts, the consumers' injuries have been redressed. Finally, Kennedy asserts that the *Verity* analysis should control this issue. *See FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 67–70 (2nd Cir.2006).

The FTC argues that the *Verity* analysis should not be applied to this case. It argues that complete relief for the consumers requires that the full amount of the billing charges be returned to the consumers. And, because *Verity* would limit the consumers' recovery to the amount that Kennedy personally received as a result of his fraudulent conduct, it should not apply. The FTC points to *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711 (5th Cir.1982), as the appropriate authority.

The Court is of the opinion that *FTC v. Southwest Sunsites, Inc.,* controls. There, the Fifth Circuit held that Section 13(b) of the Act, 15 U.S.C. § 53(b), grants to the Court the discretion to exercise the "full range of equitable remedies traditionally available to it." *Id.* This would include a finding that Kennedy is jointly and severally liable to the consumers for all their damages irrespective of other settlements.

■ The Court finds that the preponderance of the evidence supports the finding that Kennedy should be both enjoined from future conduct and answer in monetary damages because of his acts and the acts of the individual and corporate defendants. The Court finds that Kennedy had actual or constructive knowledge that the telemarketers were making and did make false representations to consumers. Recall that Kennedy was a key manager of WSM during the relevant and critical timeframe 2001 through 2006. *See* [FTC Exhibit Nos. 27 and 34].

Therefore, the Court FINDS and CONCLUDES that, without regard for his intentions to or not violate the Act, Kennedy participated in unfair billing practices and deceptive marketing. Moreover, Kennedy shared in the proceeds of the sales from the illegal conduct. *Id., See also FTC v. Publ'g Clearing House,* 104 F.3d at 1171. In addition, Kennedy was listed as a corporate officer of WSM, participated in corporate affairs, received the benefits of employment and ownership, handled consumer complaints, wrote telemarketing scripts, dealt with the LEC accounts and engaged in activities with and on behalf of the telemarketers for the benefit of WSM. An individual may be held liable for injury caused by unfair and deceptive practices on the part of his corporation, particularly where he had actual or constructive knowledge of the practices and had the authority to stop the practices. *See Publishing Clearing House,* 104 F.3d at 1171. Based on the Temporary Receiver's Final Report and the FTC's expert witness report, the Court finds that the consumer injury is $5,288,131.42. *See* [FTC Exhibit No. 523]. The Court credits against this sum $1,180,000, settlement funds paid by the dismissed defendants. The FTC shall recover $4,108,131.42 from Kennedy. A Final Judgment shall issue.

It is so Ordered.

### FINAL JUDGMENT AND ORDER FOR PERMANENT INJUNCTION

The Federal Trade Commission ["FTC"] shall have judgment against Steven L. Kennedy for a permanent injunction and monetary damages in this matter pursuant to Sections 5(a) and 13(b) of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 53(b), based on findings that Kennedy engaged in unfair and deceptive acts and practices in violation of the Act.

## I. PROHIBITED MISREPRESENTATIONS

IT IS THEREFORE ORDERED that in connection with the telemarketing, advertising, promotion, offering for sale, or sale of any Internet services, Steven L. Kennedy, his agents, servants, employees, and attorneys, and all other persons or entities in active concert or participation with him who receive actual notice of this Final Judgment and Order by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, affiliate, division, or other device, are hereby permanently RESTRAINED and ENJOINED from misrepresenting, expressly or by implication, any material fact, including, but not limited to, misrepresenting:

A. That a free trial service will be cancelled automatically if the authorized purchaser does not affirmatively approve the continuation of the service;

B. That a verification recording is being made for any purpose other than to document the authorized purchaser's express informed consent; and

C. That an authorized purchaser is obligated to pay any charge for which the authorized purchaser has not given express informed consent.

## II. PROHIBITED BILLING PRACTICES

IT IS FURTHER ORDERED that in connection with the telemarketing, advertising, promotion, offering for sale, or sale of any Internet services, Steven L. Kennedy, his agents, servants, employees, and attorneys, and all other persons or entities in active concert or participation with him who receive actual notice of this Final Judgment and Order by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, affiliate, division, or other device, are hereby permanently RESTRAINED and ENJOINED from, directly or indirectly, billing or receiving money, or assisting others in billing or receiving money, from any authorized purchaser without the authorized purchaser's express informed consent.

## III. INJUNCTION AGAINST PROVIDING CUSTOMER LISTS

IT IS FURTHER ORDERED that Steven L. Kennedy is hereby permanently RESTRAINED and ENJOINED from selling, renting, leasing, transferring or otherwise disclosing the name, address, telephone number, social security number, or other identifying information of any person who purchased services from Websource Media, LLC, Websource Media L.P., BizSitePro, LLC, Eversites, LLC, Telsource Solutions, Inc., Telsource International, Inc., or related individuals or entities at any time prior to the date of entry of this Final Judgment and Order. *Provided*, however, that Kennedy may disclose such identifying information to a law enforcement agency or as required by any law, regulation or court order.

## IV. MONETARY JUDGMENT

Finally, IT IS ORDERED that:

Judgment in the amount of Four Million One Hundred Eight Thousand One Hundred Thirty One Dollars and Thirty–Two Cents ($4,108,131.32); post-judgment interest shall accrue on this judgment at the rate of 1.52% per annum; and, costs of court are assessed against Steven L. Kennedy and in favor of the FTC.

All funds paid pursuant to this Final Judgment and Order shall be deposited into a fund administered by the FTC or its agent to be used for equitable relief, including, but not limited to, consumer redress and any attendant expenses for the administration of any redress fund. In the event that direct redress to consumers is

wholly or partially impracticable or funds remain after redress is completed, the FTC may apply any remaining funds for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Kennedy's conduct found in the Memorandum and Order. Any funds not used for such equitable relief shall be deposited to the Treasury of the United States as disgorgement. Steven L. Kennedy shall have no right to challenge the FTC's choice of remedies under this section. Moreover, Steven L. Kennedy shall have no right to contest the manner of distribution chosen by the FTC. No portion of any payments under the judgment herein shall be deemed a payment of any fine, penalty, or punitive assessment.