CECILIA M. ALTONAGA, UNITED STATES DISTRICT JUDGE
On March 11, 2019, Magistrate Judge McAliley entered a Report [ECF No. 251] on Plaintiff, Federal Trade Commission's Motion for Summary Judgment [ECF No. 228]. Judge McAliley recommends the Court grant Plaintiff's Motion and enter a permanent injunction against pro se Defendants, *1267 Dustin Pillonato and Justin Ramsey. (See Report 1289-90). On March 18, 2019, Defendants timely filed their Objections [ECF No. 253] to the Report. Plaintiff filed its Response to Defendants' Objections [ECF No. 255] ("Pl.'s Resp. to Objs.") on March 21, 2019.
When a magistrate judge's "disposition" has properly been objected to, as is the case here, district courts must review the disposition de novo . Fed. R. Civ. P. 72(b)(3). Defendants timely filed objections to the Report (see generally Objs.), and so the Court reviews the record de novo . The Court has carefully reviewed the parties' written submissions, the record, and applicable law. For the following reasons, Judge McAliley's Report is affirmed, and Plaintiff's Motion for Summary Judgment is granted.
I. BACKGROUND
The Report details the relevant facts. (See Report 1274-81). Judge McAliley relies on Plaintiff's Statement of Undisputed Material Facts [ECF No. 229] ("Pl.'s SOF"), as Defendants failed to file their own statement of material facts. (See Report 1274 (citing cases) ). The Court agrees and fully adopts Plaintiff's facts here. Given Defendants' status as pro se litigants, however, the Court also considers all evidence Defendants reference in their briefing.
For brevity, the undersigned outlines the general nature of the case, reserving specific reference to the evidence in her analysis below. The dispute involves Plaintiff's allegations against various companies and their principals for deceptive representations, unfair billing practices, and abusive telemarketing practices. (See generally First Amended Complaint [ECF No. 109] ). Every Defendant in the case, other than Pillonato and Ramsey, as principals of Pointbreak Media, LLC and Modern Source Media LLC (see id. ¶¶ 16-17), has either settled or has defaulted.
Plaintiff asks the Court to enter summary judgment, a permanent injunction, and a money judgment for $ 3,367,666.30, jointly and severally, against Pillonato and Ramsey. (See generally Mot.). Plaintiff moves for summary judgment on all claims for which Pillonato and Ramsey are named as Defendants: (1) Section 5(a) of the FTC act for alleged misrepresentations to induce consumers to purchase "claiming and verifying" and Citation Program services under both a personal liability and common enterprise theory (Count I) (Am. Compl. ¶¶ 208-10); (2) Section 5(a) of the FTC Act for Pointbreak Media's unfair billing practices (Count II) (see id. ¶¶ 211-13); and (3) Telemarketing Sales Rule ("TSR"), 16 C.F.R. section 310.4(b), arising from Pointbreak Media's initiation of unlawful prerecorded messages and robocalls to numbers on the National Do Not Call Registry (Counts III and IV) (see id. ¶¶ 224-27).
The parties have completed extensive briefing. In all, Plaintiff filed its Motion, Reply [ECF No. 241], and Response to Defendants' Objections. Defendants filed a Response [ECF No. 234], Surreply [ECF No. 244], and their Objections to the Report. Plaintiff's Motion is ripe for review.
II. ANALYSIS
In her Report, Judge McAliley thoughtfully addresses every argument Defendants raise in opposition to Plaintiff's Motion. (See Report 1281-87). The Magistrate Judge also references the arguments in Plaintiff's Motion that Defendants do not challenge. (See generally id. ). Having had the benefit of reviewing Defendants' Objections, the undersigned addresses the merits of Plaintiff's Motion by evaluating the four claims against Pillonato and Ramsey. The Court concludes by addressing, *1268 and ultimately rejecting, Defendants' remaining objections.
A. Count I
In Count I, Plaintiff alleges Pillonato and Ramsey made false, misleading, and unsubstantiated representations, in violation of Section 5(a) of the FTC Act. (See Am. Compl. ¶ 210). Section 5 prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). To establish a violation of Section 5, Plaintiff must prove: "(1) there was a representation, (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." F.T.C. v. Tashman , 318 F.3d 1273, 1277 (11th Cir. 2003) (citations omitted).
Plaintiff has established all the elements of a claim under Section 5(a) as a matter of law. (See Report 1281). Defendants have not challenged this conclusion in either their briefing before or after the Report. (See generally Resp.; Surreply; Objs.). The Court has independently reviewed the evidence and agrees there is no genuine dispute of material fact that Pointbreak Media's robocalls and live sales agent calls violated Section 5(a). In so doing, the undersigned fully adopts the Report's analysis on Count I here. (See Report 1281-83).
But the Court's analysis does not stop there, for Plaintiff asks the Court to hold Pillonato and Ramsey liable for the conduct of Co-Defendants , Modern Spotlight LLC, Modern Spotlight Group LLC, Perfect Image Online LLC, National Business Listings LLC, and DCP Marketing LLC (the "Co-Defendants") under a common enterprise theory. (See id. 1282-84). Plaintiff also asks the Court to find Pillonato and Ramsey liable for the conduct of the Co-Defendants under a personal liability theory. (See id. 1284-86). The Court addresses both theories of liability in turn.
i. Common Enterprise Liability
The Court first turns to common enterprise liability. "When a common enterprise exists, each corporation may be held liable for the others' violations." F.T.C. v. Life Mgmt. Servs. of Orange Cty., LLC , 350 F.Supp.3d 1246, 1257 (M.D. Fla. 2018) (citation omitted).
Pillonato and Ramsey do not dispute that Modern Source Media, Perfect Image Online, National Business Listings, and DCP Marketing, along with Pointbreak Media, were part of a common enterprise. (See generally Resp., Surreply; Objs.). After reviewing the record and applicable law, the Court agrees that Modern Source Media, Perfect Image Online, National Business Listings, DCP Marketing, and Pointbreak Media were part of a common enterprise. (See Report 1282-84).
Defendants only dispute the Magistrate Judge's conclusion that Modern Spotlight and Modern Spotlight Group (the "Modern Spotlight Defendants") are also part of the common enterprise. (See Resp. 1-4; Surreply 1-2; Objs. ¶ 1). In support, Defendants supply the Declaration of Michael Pocker, another Defendant in the case and the principal of the Modern Spotlight Defendants. (See Resp. 10-14).
Mr. Pocker's statement reflects that the Modern Spotlight Defendants traded office space and Modern Spotlight subleased office space from Pointbreak Media. (See id. ). Mr. Pocker also states while some employees worked for both Pointbreak Media and the Modern Spotlight Defendants, no employees worked for the entities simultaneously. (See id. ). To Defendants, this declaration creates an issue of material fact whether the Modern Spotlight Defendants were part of the common enterprise. (See id. ). The Court disagrees.
*1269 Under the FTC Act, "a corporate entity can be held liable for the conduct of other entities where the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities." F.T.C. v. Lanier Law, LLC , 715 F. App'x 970, 979 (11th Cir. 2017) (internal quotation marks and citation omitted). In determining if a common enterprise exists, courts consider whether the businesses "share office spaces and employees, commingle funds, coordinate advertising efforts, and operate under common control." Id. (citation omitted). While courts are expected to weigh these factors, they are primarily tasked with evaluating the "pattern and frame-work of the whole enterprise." F.T.C. v. HES Merch. Servs. Co. , No. 6:12-cv-1618-Orl-22KRS, 2014 WL 6863506, at *5 (M.D. Fla. Nov. 18, 2014), aff'd , 652 F. App'x 837 (11th Cir. 2016) (internal quotation marks and citation omitted).
The Report describes the extensive cooperation between the Modern Spotlight Defendants and Pointbreak Media and Modern Source Media to induce customers to purchase their services. (See Report 1282-84). For example, the companies shared client data. Modern Spotlight Group sold its claiming and verification customer leads exclusively to Modern Source Media; and Modern Source Media sold its Citation Program services exclusively to Modern Spotlight Group customers. (See Pl.'s SOF ¶¶ 56, 58). Modern Spotlight Group also scheduled Citation Program sales calls for Modern Source Media; and Modern Source Media provided phone numbers to Modern Spotlight Group, which placed claiming and verification robocalls to those numbers. (See Declaration of Michael Pocker [ECF No. 229-111] ¶ 57; see also Supplemental Declaration of Michael Pocker [ECF No. 241-2] ¶ 4). Tellingly, Modern Source Media's own employees do not distinguish between Modern Source Media and Modern Spotlight Group, telling consumers the companies were a single business. (See Pl.'s Resp. to Objs. 3-4). Ramsey acknowledged that Pointbreak Media was completely dependent on Modern Spotlight Group for its survival. (See December 14, 2017 E-mail from Ramsey to Pillonato [ECF No. 229-59] 3 (stating "all ... we have ... "[r]ight now its [sic] pocker and pocker only." (alterations added) ) ).
The Report also highlights the following undisputed evidence, which in the aggregate, most certainly shows a common enterprise existed between Pointbreak Media and the Modern Spotlight Defendants: (1) Pointbreak Media and Modern Spotlight shared a credit card merchant account; (2) Pointbreak Media and the Modern Spotlight Defendants used similar robocall and live sales agent scripts; (3) Pocker, Pillonato, and Ramsey discussed the companies' sales scripts with each other; (4) Pointbreak Media's office space and employees became Modern Spotlight Group's offices and employees; and (5) Modern Spotlight Group used similar customer contracts and welcome emails as Pointbreak Media. (See Report 1283-84 (citing Pl.'s SOF ¶¶ 5, 7, 14, 15, 27, 28, 29) ). These "undisputed facts demonstrate that the [Modern Spotlight Defendants] operated as part of a common enterprise with the other Corporate Defendants." F.T.C. v. Johnson , 156 F.Supp.3d 1202, 1208 (D. Nev. 2015) (alteration added) (entering summary judgment for the FTC and finding common enterprise liability existed where entities commingled funds and coordinated their sales efforts).
Despite this compelling, conclusive, and indisputable record evidence, Defendants ask the Court to consider, in rigid form, the factors of shared office space, shared employees, and common control. (See Objs.
*1270 ¶ 2). The crux of Defendants' argument is that a triable issue of fact exists on the question of common enterprise liability because Pointbreak Media and the Modern Spotlight Defendants did not simultaneously share employees and office space. This argument fails to persuade.
F.T.C. v. Life Management Services of Orange County, LLC , 350 F.Supp.3d 1246 (M.D. Fla. 2018), is instructive. There, the court was similarly tasked with determining whether common enterprise liability existed between two companies, Loyal and LMS. See id. at 1257-58. The indisputable record evidence overwhelmingly supported a common enterprise finding, including a shared merchant account and LMS submitting identical scripts and documents as Loyal. See id. at 1258. That the companies' addresses were "overlapping" although not identical did not alter the court's conclusion that the evidence was so one-sided for the FTC to prevail on summary judgment. Id. (footnote call number and citations omitted).
So, too, here the undisputed material facts dictate summary judgment in Plaintiff's favor on the question of common enterprise liability. Contrary to Defendants' insistence, common enterprise liability does not require a finding of contemporaneous shared employees and office space. Plaintiff need not "prove any particular number of entity connections" or "any specific connection." F.T.C v. Kennedy , 574 F.Supp.2d 714, 722 (S.D. Tex. 2008). Rather, Plaintiff must show that Pointbreak Media and the Modern Spotlight Defendants "maintained an unholy alliance." Id. (internal quotation marks and citation omitted). This, Plaintiff has done. Because Mr. Pocker's Declaration "is insufficient evidence 'for a jury to return a verdict' in [Defendants'] favor" on the question of common enterprise, "summary judgment [is] appropriate." Lanier Law, LLC , 715 F. App'x at 980 (quoting Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ) (alterations added).
Given that the Modern Spotlight Defendants are part of the common enterprise, Pointbreak Media and Modern Source Media are liable for the Modern Spotlight Defendants' deceptive sales. Ramsey and Pillonato, as principals of Pointbreak Media and Modern Source Media, are therefore liable for the entire common enterprise's wrongdoing.
ii. Personal Liability
Plaintiff also asks the Court to impose liability on Pillonato and Ramsey through a personal liability theory. (See generally Mot.). For the Court to impose personal liability, Plaintiff "must first show that the corporation committed violations of those acts for which it is liable." F.T.C. v. Primary Grp., Inc. , 713 F. App'x 805, 806-07 (11th Cir. 2017) (per curiam) (citation and footnote call number omitted). Once corporate liability is established, Plaintiff must then show "the individual knew of the deceptive practices and either participated directly in those practices or had the authority to control them." Id. at 807 (quoting F.T.C. v. IAB Mktg. Assocs., LP , 746 F.3d 1228, 1233 (11th Cir. 2014) ). The Eleventh Circuit recently explained that "knowledge may be established by showing that the individual had actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth." Id. (internal quotation marks and citations omitted).
Defendants initially contested a finding of personal liability with respect to the Modern Spotlight Defendants' deceptive sales, focusing on the "control" element of the personal liability inquiry. (See *1271 Resp. 3). But Pillonato and Ramsey are personally liable for the Modern Spotlight Defendants' deceptive sales because they directly participated in the deceptive sales practices. Indeed, Pillonato and Ramsey (1) provided phone numbers for the Modern Spotlight Defendants to robocall and a merchant account for them to use; (2) shared welcome emails and contracts with them; and (3) coordinated with the Modern Spotlight Defendants on how to transfer customers to Modern Source Media. (See Pl.'s SOF ¶¶ 27, 29; see also Supplemental Declaration of Michael Pocker ¶¶ 4, 6, 9-10). As Plaintiff points out, day-to-day involvement of the Modern Spotlight Defendants' activities is unnecessary to establish direct participation. (See Pl.'s Resp. to Objs. 7). Where individuals obtained merchant bank accounts for an entity, as Pillonato and Ramsey did for Modern Spotlight (see Pl.'s SOF ¶ 27), they directly participated in the entity's wrongdoing. See F.T.C. v. J.L. Publ'ns, Inc. , 99 F.Supp.2d 1176, 1206 (C.D. Cal. 2000). Plaintiff has established that Pillonato and Ramsey directly participated in the Modern Spotlight Defendants' deceptive sales practices as a matter of law.
In their briefing since the Report, Defendants no longer challenge the indisputable evidence that they either participated directly in deceptive sales practices (in the case of some members of the common enterprise like the Modern Spotlight Defendants) or had the authority to control them. Nor could they. (See Report 1284-85).
Instead, Pillonato and Ramsey now argue a triable issue of fact exists on the knowledge element of the personal liability inquiry. (See Objs. ¶ 7). Specifically, Defendants insist they could not have known of the other entities' deceptive practices when they opposed all illegal activities and instructed employees to not mislead customers into thinking Pointbreak Media and Google were one and the same. (See id. ). In support, Defendants supply Pointbreak Media's co-owner, Beau Strickland's testimony, stating Ramsey and Pillonato opposed all illegal activities. (See id. ).
The Court must again disagree with Defendants. Mr. Strickland's testimony amounts to a "mere scintilla of evidence" in the context of the entire record establishing Pillonato and Ramsey certainly had or should have had knowledge of Pointbreak Media's deceptive practices, as well as the deceptive practices of all the other entities. (Report 1284-85 (citation omitted) ).
Indeed, at a minimum, Pillonato and Ramsey should have known of the entities' (including the Modern Spotlight Defendants') deceptive sales practices. Even if Defendants' "protestations [they were] not aware of the content of the scripts, the texting, or any other illegal behavior" were true, that would be "only because [they] intentionally avoided discovering [them] despite knowing that there was a high probability that [the entities were] engaging in" deceptive sales practices. Primary Group, Inc. , 713 F. App'x at 808 (internal quotation marks and citations omitted; alterations added). Plaintiff is therefore entitled to summary judgment on a personal liability theory. See F.T.C. v. Williams, Scott & Assocs., LLC , 679 F. App'x 836, 839 (11th Cir. 2017) (per curiam) (affirming summary judgment in favor of the FTC finding principal personally liable where the undisputed evidence supported the conclusion the individual "should have known about [the entity's] illegal activities." (alteration added) ).
B. Count II
Pillonato and Ramsey do not challenge the Magistrate Judge's findings as to Count II. (See generally Objs.). The undersigned *1272 has reviewed the Report, the record, and the applicable law. For the reasons discussed in detail in the Report, the Court agrees Plaintiff has established the absence of a triable issue of fact on the elements of a claim of unfair billing practices under Section 5(a) of the FTC Act. (See Report 1285-86). Plaintiff is entitled to summary judgment against Pillonato and Ramsey on Count II.
C. Counts III and IV
Counts III and IV involve allegations Pillonato and Ramsey violated the TSR. (See Am. Compl. ¶¶ 224-227). These claims arise from the robocalls Pointbreak Media made, including millions of calls to telephone numbers on the National Do Not Call Registry. The undisputed evidence supports, and Defendants do not dispute, that (1) Pointbreak Media was a telemarketer and a seller under the TSR; and (2) Pointbreak Media, with Pillonato and Ramsey's knowledge, initiated robocalls, including robocalls to telephone numbers on the National Do Not Call Registry. (See Report 1286).
In their initial briefing, Pillonato and Ramsey argued Pointbreak Media calls should benefit from the business-to-business exception. (See Resp. 6). The TSR exempts "[t]elephone calls between a telemarketer and any business to induce the purchase of goods or services ...." 16 C.F.R. § 310.6(b)(7) (alterations added). The Magistrate Judge correctly rejected Defendants' unsupported and conclusory assertion that any calls from Pointbreak Media received by non-businesses were made in error. (See Report 1287). Even if this assertion were supported by the evidence, Defendants' subjective intentions are irrelevant, as the business-to-business exemption only applies to telephone calls between telemarketers and businesses. (See id. (citing Inc21.com Corp. , 745 F.Supp.2d 975, 1007 (N.D. Cal. 2010) ) ). Plaintiff thus prevails on summary judgment against Defendants on Counts III and IV.
D. Miscellaneous Objections
Defendants' remaining objections all fail to persuade. First, contrary to Defendants' contention (see Objs. ¶ 6), the Magistrate Judge correctly recommended a proposed judgment of $ 3,367,666.30 against Pillonato and Ramsey. Under the FTC Act, "courts have justly imposed joint and several liability where a common enterprise exists." F.T.C. v. WV Universal Mgmt., LLC , 877 F.3d 1234, 1240 (11th Cir. 2017) (citation omitted). And "[i]f an individual may be held personally liable for corporate violations of the FTC Act ... nothing more need be shown to justify imposition of joint and several liability for the corporation's restitution obligations." F.T.C. v. Commerce Planet, Inc. , 815 F.3d 593, 600 (9th Cir. 2016) (alterations added). Finally, "[i]f two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount." Honeycutt v. United States , --- U.S. ----, 137 S.Ct. 1626, 1631, 198 L.Ed.2d 73 (2017) (alteration added; citation omitted).
Defendants' objection ignores "well-established principles of joint and several liability." (Pl.'s Resp. to Objs. 9). The case law makes clear that although Plaintiff cannot collect from Pillonato and Ramsey any amount it has already recovered from the other named Defendants, that limitation does not change the amount of the money judgment. This objection is overruled.
Defendants also object to the recommended bans on telemarketing and remotely created payment orders ("RCPO[s]"). (See Objs. ¶¶ 4-5). While the *1273 Court could reject these two objections on the basis that Defendants failed to raise them in their Response or Surreply, the Court exercises its discretion to review them on their merits given Defendants' pro se status.
Defendants contend the RCPO ban is overbroad because it will prevent them from accepting "any all checks." (Id. ¶ 4). Not so. The Proposed Final Order of Permanent Injunction and Monetary Judgment [ECF No. 251-1] ("Proposed Final Order") only prohibits Defendants from accepting a check if it is "initiated or created by or on behalf of the payee." (Id. 5). As Plaintiff notes, an RCPO "is created not by the party on whose account it draws (the payor), but rather by the party accepting payment (the payee)." (Pl.'s Resp. to Objs. 9). Because Defendants may still accept checks written by their customers, the Proposed Final Order is not overbroad.
Defendants also object to the telemarketing ban in the Proposed Final Order because it "effectively prohibit[s] them from using a telephone in any manner whatsoever in conducting any business whatsoever ...." (Objs. ¶ 5 (alterations added) ). Defendants are again mistaken. The Proposed Final Order only precludes Pillonato and Ramsey from using telephones as part of a telemarketing sales campaign. (See Proposed Final Order 5). Defendants are otherwise free to use telephones in connection with any job or business. Given Defendants' history of unlawful marketing (see Report 1280), the telemarketing ban in the Proposed Final Order is not overbroad.
Defendants' objection to the Proposed Final Order's requirement they turn over certain items of jewelry to the Receiver because they purportedly do not possess the requested items fares no better. (See Objs. ¶ 3). Plaintiff has supplied receipts showing Ramsey purchased the jewelry. (See Certification of Records of Regularly Conducted Activity [ECF No. 241-3] ). This evidence corroborates the adverse inference that can be drawn from Defendants' Fifth Amendment invocation when asked questions about the items at their depositions. (See Pl.'s Resp. to Objs. 10 (citations to the record omitted) ).
Finally, Defendants ask "to be heard on the terms of the injunction," in the event the Court does not accept their other objections. (Objs. ¶ 8). Defendants have had the benefit of multiple rounds of briefing, including raising objections pertinent to the terms of the Proposed Final Order. (See id. ¶¶ 3-5). The undersigned sees no need for yet another round of motion practice on the scope of the permanent injunction.
III. CONCLUSION
For the foregoing reasons, it is
ORDERED AND ADJUDGED that the Report [ECF No. 251] is AFFIRMED . Plaintiff, Federal Trade Commission's Motion for Summary Judgment [ECF No. 228] is GRANTED . A permanent injunction against Defendants will be entered by separate order.
DONE AND ORDERED in Miami, Florida, this 4th day of April, 2019.
REPORT AND RECOMMENDATIONS
CHRIS McALILEY, UNITED STATES MAGISTRATE JUDGE
Plaintiff Federal Trade Commission ("FTC") has filed a Motion for Summary Judgment Against Defendants Dustin Pillonato and Justin Ramsey, which the Honorable Cecilia M. Altonaga referred to me. (ECF Nos. 228, 245). Pillonato and Ramsey filed an Opposition, and the FTC filed a Reply to which Pillonato and Ramsey, *1274 with leave of Court, filed a Sur-Reply. (ECF Nos. 234, 241, 243, 244). I have carefully considered the parties' memoranda of law, the pertinent portions of the record and the applicable law. For the reasons set forth below, I recommend that the Court grant the FTC's Motion for Summary Judgment.
I. BACKGROUND
A. Procedural Background
This is an action for violation of Section 5(a) of the FTC Act and the Telemarketing Sales Rule, promulgated pursuant to the Telemarketing Act, that alleges the defendants engaged in deceptive representations, unfair billing practices and abusive telemarketing practices. The FTC's Amended Complaint seeks monetary and injunctive relief against several companies and their principals, including Pillonato and Ramsey and their companies Pointbreak Media, LLC, DCP Marketing, LLC, Modern Source Media, LLC, National Business Listings, LLC and Allstar Data, LLC. (ECF No. 109). Early in this lawsuit, the Court entered a preliminary injunction against Pillonato and Ramsey and each of their companies, with the exception of Allstar Data and National Business Listings. (ECF No. 64). The FTC now asks this Court to enter final summary judgment against Pillonato and Ramsey and a permanent injunction and a money judgment in the amount of $ 3,367,666.30 against both of them, jointly and severally.[1] (ECF Nos. 228 at 24; 241 at 1 n.1).
B. Undisputed Material Facts
Relying on the FTC's Statement of Undisputed Material Facts ("SUMF"),[2] the Court sets forth below those undisputed material facts necessary to resolve the motion for summary judgment. Unless otherwise noted, the Court cites to the pertinent paragraphs of the SUMF. The Court does this having thoroughly reviewed the evidence the FTC cites in in the SUMF in support of each assertion, and having confirmed that each assertion relied upon in this report and recommendation is supported by some, if not all, of the cited evidence.[3]
The Court finds the following facts to be undisputed for several reasons. First and foremost, Pillonato and Ramsey did not file their own statement of material facts as required by Local Rule 56.1(a). "All material facts set forth in the movant's statement...will be deemed admitted unless controverted by the opposing party's statement [of material facts], provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b). The Court recognizes that Pillonato and Ramsey are *1275 not represented by counsel, but their pro se status does not excuse their compliance with the Local Rules of this Court.[4] See Williams v. Slack , 438 F. App'x. 848, 850 (11th Cir. 2011) ("Local Rule 56.1 is an ordinary procedural rule of civil litigation that we do not interpret so as to excuse mistakes by those who proceed without counsel.") (quotation marks and citation omitted). The Court may therefore deem the facts set forth in the SUMF as admitted. See Smith v. Mercer , 572 F. App'x. 676, 678 (11th Cir. 2014) ("[D]espite [plaintiff's] pro se status, the district court did not abuse its discretion in applying N.D. Ga. L.R. 56.1 to deem Defendant's facts admitted.").[5]
Second, in their Opposition, Pillonato and Ramsey do not address, much less contradict, any of the facts set forth in the SUMF, and thus, they concede those facts. (ECF No. 234). Their Opposition does include a declaration from a co-defendant and a deposition excerpt from a co-owner of Pointbreak, but none of the information contained therein is inconsistent with the SUMF. (Compare ECF No. 234 at pp. 10-17 with ECF No. 229 at ¶¶ 24-31). "[T]he nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." Picardat v. City of Miami , No. 15-cv-24305-GAYLES, 2017 WL 1251897 at *2 (S.D. Fla. April 5, 2017) (citing Harrison v. Culliver , 746 F.3d 1288, 1298 (11th Cir. 2014) ). Pillonato and Ramsey have not done this, and they have thus failed to create a genuine dispute regarding any of the facts set forth in the SUMF.
Last, the FTC questioned Pillonato and Ramsey at their respective depositions regarding many of the facts set forth in the SUMF, and both invoked their Fifth Amendment privilege against self-incrimination in response to those questions. The Eleventh Circuit Court of Appeals "has held [ ] that the trier of fact may take an adverse inference against the parties to a civil action refusing to testify on Fifth Amendment grounds." United States v. Two Parcels of Real Property Located in Russell County, Ala. , 92 F.3d 1123, 1129 (11th Cir. 1996) (citation omitted).[6] The Court is mindful that adverse inferences "may not result in automatic summary judgment" and the FTC must provide evidence beyond the adverse inference for any matter on which it carries the burden of proof. Securities and Exchange Commission v. Calmes , Case No. 09-80524-CIV-Zloch/Rosenbaum, 2010 WL 11505260 at *4 (S.D. Fla. Nov. 19, 2010). Here, the Court may infer that the answers Pillonato and Ramsey refused to provide on Fifth Amendment grounds would have been unfavorable to them because, as noted above, the FTC has provided probative evidence to corroborate the facts set forth in the SUMF.
1. The Telemarketing Scheme
Defendants Pointbreak Media, LLC ("Pointbreak"), and Modern Spotlight Group, LLC and Modern Spotlight, Inc.
*1276 (together, "Modern Spotlight"), Perfect Image Online, LLC, National Business Listings, LLC and Modern Source Media, LLC conducted a telemarketing operation from November 2016 through May 2018 that targeted consumers, including consumers on the National Do Not Call Registry, with tens of millions of robocalls (i.e., calls with a prerecorded message). This scheme also used calls by live sales agents who made false promises and threats to convince consumers to purchase, for a significant fee, otherwise free Google "claiming and verification services." (ECF Nos. 229, SUMF, at ¶¶ 4-16; 229-26). Pointbreak and Modern Source also conducted a telemarketing operation that targeted those consumers who had already purchased "claiming and verification services," and used false promises of top placement in search results, to persuade them to purchase, for a significant recurring monthly fee, a purported search engine optimization service called the "Citation Program." (Id. at ¶¶ 17-18).
2. The Robocalls
Pointbreak, Modern Spotlight and Perfect Image placed robocalls to consumers weekly, and sometimes daily, over a period of several months in 2017. (Id. at ¶ 4). During the seven-week period between July 3, 2017 and August 25, 2017, Pointbreak alone made nearly 75 million robocalls, nearly 15 million of which were to telephone numbers on the National Do Not Call Registry ("DNC Registry"). (Id. at ¶¶ 4, 6; ECF No. 229-87 at 3-4). The robocalls were the first stage of the Defendants' telemarketing scheme. They contained false threats of removal from Google and, with respect to Pointbreak, false statements of affiliation with Google. (ECF No. 229, SUMF, at ¶¶ 5-7).
For example, a robocall from Pointbreak identified the caller as a "data service provider for Google and Bing...This is your final notice. If you do not act soon, Google will label your business as permanently closed. Press one now to speak with me or another Google specialist. Did you know that 74 percent of your customers search online before making a purchase? If your Google listing is shut down, you will lose on all of those potential customers." (Id. at ¶ 5). Another robocall identified Pointbreak as a "third party service provider for Google." (Id. ).
A robocall from Modern Spotlight told the consumer that "Your Google Business listing may be inactive. Immediate action is required. Please press one to speak with a representative and avoid being removed from Google." (Id. at ¶ 7). Perfect Image used a similar robocall. (Id. ).
In fact, Pointbreak had no affiliation or association with Google, and Google does not remove a business from search results or label it "permanently closed" if the business owner does not claim and verify the business. (Id. at ¶¶ 19-20).
3. Live Sales Pitches
Those consumers who pressed one in response to the robocalls were transferred to a live sales agent for either Pointbreak, Modern Spotlight, Perfect Image or National Business Listings. (Id. at ¶¶ 9-15). These sales agents used a host of false representations to sell consumers a purported "claiming and verification" service. (Id. at ¶¶ 9-15, 19-23). For example, the sales agents claimed various forms of affiliation with Google, including that they were an "authorized Google My Business" agency or representative, an "affiliate branch," a "subsidiary that Google hires," a "third party basically contracted by Google" or a "Google Business Partner." (Id. at ¶ 13). In truth, Google had no affiliation or association with either Pointbreak, Modern Spotlight, Perfect Image or National Business Listings, it had not contracted with those Defendants, nor did it approve, sponsor or *1277 endorse their services.[7] (Id. at ¶ 19). None of these Defendants were a service provider for Google, or an authorized "Google My Business agency." (Id. ).
The sales agents told consumers they would face adverse consequences if they did not claim and verify their business with Google, which was untrue. (Id. at ¶¶ 10-12, 20). For example, sales agents stated that (i) "Over the next 6-8 months businesses that are not claimed and verified with Google run the risk of possibility [sic] being removed from the search engine or pushed so far down the search engine that no one will find you," (ii) failure to claim and verify the business "is causing your listing to NOT display, or display IMPROPERLY, and MAY be at risk of being removed," and (iii) purchase of the claiming and verifying service was necessary to "avoid removal" from Google, and refusal to do so would cause the business listing to be "removed entirely from the search engine" or "removed from the internet." (Id. at ¶¶ 10-12) (emphasis in original). In truth, Google does not remove a business from search results if the owner does not claim and verify the business, and Google search results include unclaimed and unverified businesses. (Id. at ¶ 20).
Sales agents tried to convince consumers to purchase their services by promising that the claiming and verification process included "registering" or "claiming" keywords, which would allow the business to be prominently displayed in search results. (Id. at ¶¶ 14-15, 21-22). For example, Pointbreak and NBL sales agents told consumers that "part of the claiming and verification process is registering your keywords, so you come up prominently when someone is searching for your goods and services." (ECF Nos. 229-32 at 40; 229-35 at 2). Modern Spotlight and Perfect Image similarly claimed that keywords are "one of the most important parts of the verification process." (ECF No. 229-112 at ¶ 7, p. 14). Some Pointbreak sales agents stated that the assigned keywords would be unique to the business, or that the keywords would give the business top placement in search results. (ECF No. 229, SUMF, at ¶ 15).
These promises were false. The claiming and verification process does not include claiming or registering specific keywords. (Id. at ¶ 21). A third party cannot guarantee that a business "will appear in a particular place in Google search results for any given search term," (ECF No. 229-104 at 37:15-18), or that the listing will appear on the top or first page of Google search results, because Google uses proprietary algorithms to determine the order of search results. (ECF No. 229-104 at 38:21-25, 39:7-9).
These Defendants fraudulently charged hundreds of dollars for their claiming and verification service, when not even Google charges businesses to claim, verify and manage their business listings. (ECF Nos. 229-111 at ¶ 24; 229-35 at 5; 229-32 at 43; 229-3 at ¶ 5). Consumers purchased their services relying on Defendants' misrepresentations. (ECF No. 229, SUMF, at ¶ 23). The one-time fee that consumers paid Pointbreak for the claiming and verification service ranged between $ 300-$ 500. (Id. at ¶ 16; 229-12). There is no evidence that Pointbreak's customers benefitted from its services. In fact, for some customers, Pointbreak never provided claiming and verification services, and other customers reported that they saw no change in search results, even when searching for the *1278 claimed keywords. (ECF No. 229, SUMF, at ¶ 21).
Pointbreak, and later Modern Source, would call customers after they purchased the claiming and verification service to sell yet another service, the "Citation Program." Again, they made false claims. (Id. at ¶ 17). The sales agents reiterated that they were affiliated with Google, and told consumers that Google uses an "online visibility score" based on "52 directories [that] GOOGLE uses to decide who's credible and relevant and who's not" to determine where to place the business listing in search engine results. (Id. at ¶ 18; ECF Nos.229-36 at 5-6; 229-6 at ¶ 10; 229-7 at ¶¶ 9-10). They described the Citation Program as "get[ting] [the business] listed on every one of these directories, and over the next 30 days and [sic] we'll take your visibility score...to 100% accurate and correct." (ECF No. 229-36 at 6). The sales agents then guaranteed success, telling the consumer that the Citation Program "...isn't something that we think is going to work. This is something we know is going to work. It works every single time without exception...It's increasing your coverage every month. It's also increasing your ranking so you're coming up at the very top of the search." (ECF Nos. 229, SUMF, at ¶ 18; 229-36 at 7-8).
In fact, Google uses a proprietary algorithm to determine the order of search results, but contrary to the sales claims, that algorithm does not "boil down to an online visibility score based on an association with 52 main directories." (ECF No. 229-104 at 40:17-41:2). Google does not use 52 directories to determine which businesses are credible and relevant, (id. at 42:9-13), nor does it use a visibility score to determine search results. (Id. at 42:6-9). In truth, a third party cannot guarantee that a business will appear prominently in Google search results for any given search term. (Id. at 38:10-14).
Consumers purchased the Citation Program in reliance on these misrepresentations. (ECF Nos. 229, SUMF, at ¶ 23). They paid Pointbreak or Modern Source a one-time fee, between $ 499.99 and 849.99, and a recurring charge of $ 169.99 per month. (ECF No. 229-6 at ¶ 10; 229-7 at ¶¶ 9-10; 229-8 at ¶ 9; 229-12 at ¶ 7). Customers did not see any change in search results following purchase of the Citation Program. (ECF Nos. 229-7 at ¶ 12; 229-8 at ¶ 10).
4. Unauthorized Billing
Pointbreak accepted two forms of payment from consumers: (i) credit card or (ii) a "remotely created check" that Pointbreak generated using the bank account information that business owners provided. (ECF Nos. 229-6 at ¶ 7; 229-7 at ¶ 5; 229-11 at ¶ 4; 229-12 at ¶ 6; 229-35 at 6). Pointbreak allowed Defendant Modern Spotlight to use its credit card merchant account for a short period of time in 2017 in exchange for 30% of the fees that Modern Spotlight generated from its sales of claiming and verifying services. (ECF No. 229, SUMF, at ¶ 27). On October 20, 2017, Bank of America Merchant Services terminated Pointbreak's merchant account. (Id. at ¶ 32). Shortly thereafter, between October 23 and 27, 2017, Pointbreak wrote itself remotely created checks from at least 280 consumers' bank accounts, each in the amount of $ 100, without those consumers' prior knowledge or consent, and without providing increased services or benefits in return. (Id. at ¶ 33; ECF Nos. 229-11 at ¶ 10, 229-12 at ¶ 13).[8]
*1279 5. Pointbreak Reinvented Itself
In mid-November 2017, Pointbreak stopped making new sales to customers, but continued its business practices through Defendant DCP Marketing, LLC and Modern Source Media, LLC. (ECF No. 229, SUMF, at ¶ 28). DCP Marketing used Pointbreak as its fictious name, and a DCP merchant account with the "Point Break" alias was used to collect recurring charges from Pointbreak's Citation Program customers. (Id. ). Remotely created checks identifying Pointbreak as the payee were also deposited into DCP's checking account. (Id. ).
As for Modern Source, one of its sales agents referred to Pointbreak as "the old name" for Modern Source. (ECF No. 229-24 at 249). Modern Source sold only the Citation Program, and several of its employees had previously worked for Pointbreak. (ECF No. 229, SUMF, at ¶¶ 28-29). Modern Source teamed up with Defendant Modern Spotlight Group to sell its Citation Program. These companies had a close economic relationship. Modern Source made sales only to customers of Modern Spotlight Group, and Modern Spotlight Group provided its customers' information only to Modern Source in return for a percentage of Modern Source's sales. (Id. at ¶ 29). Modern Spotlight Group sales agents set up appointments for its customers to speak with agents from Modern Source, and would forward telephone calls to Modern Source. (ECF No. 229-11 at ¶ 57). Modern Spotlight Group also hired numerous employees who used to be employees of Pointbreak, and moved into the office space previously utilized by Pointbreak. (ECF No. 229, SUMF, at ¶ 28). A Modern Spotlight Group sales agent even stated that Pointbreak and Modern Spotlight Group had "merged companies." (Id. at ¶ 29). Further, Modern Spotlight Group, Pointbreak and Modern Source used substantially similar consumer contracts and welcome emails. (Id. ).
In early February 2018, Defendant Perfect Image took over the employees and customers that used to belong to Modern Spotlight Group. (Id. at ¶ 30). Perfect Image sold its customers' information to Modern Source until March 2018. (Id. ). At or about that time, Defendant National Business Listings began selling claiming and verification services using the same script as Pointbreak and the same office space that Pointbreak and Modern Source occupied. (Id. at ¶ 31).
6. Pillonato's Role
Pillonato was an owner and manager of Pointbreak, Modern Source, National Business Listings and DCP. (Id. at ¶ 1). He was the sole signatory on the bank accounts for Modern Source and DCP, and was a signatory on Pointbreak's bank accounts along with Ramsey. (Id. at ¶¶ 2-3). Pillonato was also the sole signatory on Modern Source's credit card merchant account and opened DCP's merchant account with the "Point Break" alias. (Id. at ¶ 1). He signed contracts with service providers and vendors on behalf of Pointbreak and Modern Source. (Id. at ¶¶ 2-3).
Pillonato, along with Ramsey, ran Pointbreak on a day-to-day basis. (Id. at ¶ 2). He maintained the "customer relationship database and train[ed] agents on upsell activities," handled "[p]roduct fulfillment" and provided telephone numbers to sales agents. (Id. ). Pillonato actively monitored Pointbreak's sales agents, and was involved in drafting Pointbreak's telemarketing sales scripts. (ECF Nos. 229-110 at ¶ 13; 229-105 at 17-18; 229-52).
Pillonato knew of the large volume of robocalls, and that Pointbreak's robocalls reached many non-businesses and phone numbers on the National Do Not Call Registry. (ECF No. 229, SUMF, at ¶ 8). Pillonato *1280 also knew the content of Modern Spotlight's robocalls. (ECF No. 229-111 at ¶¶ 13-14). Pillonato admitted that clients who purchased Pointbreak's services "saw 0 benefits" and "got 0 results" and that "only about half" of the Citation Program charges "are legit." (ECF Nos. 229-74 at 2; 229-80 at 2). Pillonato monitored and knew of consumers' negative reviews of Pointbreak, which included complaints that Pointbreak misrepresented its relationship with Google. (ECF No. 229, SUMF, at ¶ 24). Pillonato also monitored Pointbreak's credit card chargeback rate, which he described as "horrible," and knew about chargebacks that National Business Listings received.[9] (Id. at ¶¶ 24, 30). Pillonato further knew that Pointbreak deposited the unauthorized $ 100.00 checks into its bank accounts. (Id. at ¶ 34).
7. Ramsey's Role
Like Pillonato, Ramsey was an owner and manager of Pointbreak, Modern Source and National Business Listings. (Id. at ¶ 1). Ramsey was a signatory on Pointbreak's bank accounts and he opened Pointbreak's credit card merchant accounts. (Id. at ¶ 2). As noted, Ramsey and Pillonato ran Pointbreak on a day-to-day basis. (Id. ). Ramsey trained and oversaw sales agents, and provided telephone numbers to "push[ ] robocalls out to consumers." (Id. ). Ramsey knew of Pointbreak's telemarketing sales scripts and he managed Pointbreak's robocalls. (ECF No. 229-110 at ¶ 16). He drafted Pointbreak's robocall scripts, (ECF No. 229, SUMF, at ¶ 5), and was familiar with Modern Spotlight's and Modern Spotlight Group's robocall scripts. (ECF No. 229-111 at ¶¶ 13-15). Ramsey readily admitted that Modern Source was economically dependent upon Modern Spotlight Group, complaining that he does not like "all our lively hoods [sic] being with pocker [an owner and manager of Modern Spotlight Group]...[because] [r]ight now we have 0 back up its pocker and pocker only." (ECF No. 229-59 at 3).
Ramsey knew of Pointbreak's large volume of robocalls, and that many of those calls were to non-businesses and telephone numbers on the National Do Not Call Registry. (ECF No. 229, SUMF, at ¶ 8). He monitored negative reviews that consumers made about Pointbreak, which included complaints of fraud, and knew that many of the Citation Program charges were not legitimate. (Id. at ¶¶ 18, 24). Ramsey also endorsed all 280 unauthorized $ 100.00 checks, and knew that they were deposited into Pointbreak's bank accounts. (Id. at ¶¶ 32, 34).
8. Prior Court Orders
Pillonato and Ramsey have previously been enjoined from engaging in telemarketing fraud. In 2015, the Circuit Court in and for Palm Beach County, Florida entered a permanent injunction that prohibited Pillonato from, among other things, "using any false or misleading statement to induce any person to pay for goods and services." (Id. at ¶ 36; Office of the Attorney General, Dep't of Legal Affairs, State of Fla. v. Pillonato, et al . , 15-CA-002751 (Fla. Cir. Ct. June 11, 2015). Similarly, in April 2017, another division of this Court entered a permanent injunction prohibiting Ramsey from, among other things, (i) initiating or assisting others in initiating outbound telephone calls to any telephone number on the National Do Not Call Registry, (ii) initiating or assisting others in initiating outbound telephone calls to non-businesses that deliver a prerecorded message (i.e., robocalls), and (iii) violating the *1281 Telemarketing Sales Rule. (Id . , F.T.C. v. Ramsey, et al. , 17-80032-MARRA (S.D. Fla. April 14, 2017), ECF No. 229-93 at pp. 6-8). That permanent injunction required Ramsey to clearly and conspicuously disclose the identity of the seller in any telemarketing sale. (ECF No. 229-93 at p. 8).
II. ANALYSIS
A. Summary Judgment Standard
Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." Miccosukee Tribe of Indians of Fla. v. United States , 516 F.3d 1235, 1243 (11th Cir. 2008) (citation omitted). A fact is material if it "would affect the outcome of the suit under the governing law." Id. (citation omitted). The Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the nonmoving party. See Sada v. City of Altamonte Springs , 434 Fed. Appx. 845, 847 (11th Cir. 2011). To survive summary judgment, the nonmoving party must make "enough of a showing that the jury could reasonably find for that party." Gilliard v.Dep't. of Corrections , 500 Fed. Appx. 860, 863 (11th Cir. 2012) (citation omitted).
The moving party bears the initial burden of showing the absence of a genuine issue of material fact. United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala. , 941 F.2d 1428, 1437 (11th Cir. 1991) (citation omitted). The moving party must show that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala. , 941 F.2d at 1438. "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." Id. (quotation marks and citations omitted); see also Ray v. Equifax Info. Servs., L.L.C. , 327 Fed. App'x 819, 825 (11th Cir. 2009) (once the moving party satisfies its burden, "the non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof.") (quotation marks and citation omitted).
B. The FTC is Entitled to Summary Judgment on Count I
The FTC contends that Pillonato and Ramsey, through Pointbreak, made misrepresentations and omissions of material fact to induce consumers to purchase their companies' "claiming and verifying" and Citation Program services, in violation of Section 5(a) of the FTC Act. (ECF No. 228 at 17-18). Section 5 prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). To establish a violation of Section 5, the FTC must prove three elements: "(1) that there was a representation, (2) the representation was likely to mislead customers acting reasonably under the circumstances and (3) the representation was material." F.T.C. v. Tashman , 318 F.3d 1273, 1277 (11th Cir. 2003) (citation omitted).
Pillonato and Ramsey do not challenge, and thus concede, that the FTC has established all of the foregoing elements. (See generally , ECF No. 234). Further, the Court has evaluated the FTC's evidence and concludes that there is no genuine dispute of material fact that the robocalls *1282 and live sales agent calls at issue in this lawsuit violate Section 5 of the FTC Act.
First, Pointbreak's acts and practices were "in or affecting commerce" as Pointbreak, acting from its Florida offices, engaged in transactions with customers throughout the United States. (See e.g. , ECF Nos. 229-6, 229-7, 229-8, 229-11, 229-12, 229-47). Section 44 of the FTC Act defines commerce as including "commerce among the several States." 15 U.S.C. § 44.
Second, the robocalls and live sales agent calls contained numerous false representations, express and implied, including that (i) the companies were authorized by or affiliated with Google, (ii) the customer would be removed from Google's search engine if he/she did not purchase the claiming and verifying service, (iii) the claiming and verifying service includes registering keywords that cause the business listing to appear prominently in search results, and (iv) the customer's business would appear at the top of search results if the customer purchased the Citation Program. See supra at pp. 1276-78. "A representation is 'likely to mislead' if it is false," F.T.C. v. USA Financial, LLC , Case No. 8:08-CV-899-T-17MAP, 2010 WL 11508193 at *4 (M.D. Fla. April 5, 2010), or if the defendant "had no basis for the representation." Tashman , 318 F.3d at 1277. There is no dispute that these representations were likely to mislead a reasonable consumer because they were false and/or the companies lacked a reasonable basis for asserting that they were true. See supra at pp. 1276-78.
Third, these representations were material. "[A]n express claim [or] an intentionally-implied claim made by [a] seller..." is presumed material." F.T.C. v. Roca Labs, Inc. , 345 F.Supp.3d 1375, 1386 (M.D. Fla. 2018) (citations omitted). Pillonato and Ramsey offered no evidence to rebut this presumption. Beyond the presumption, "[a] representation is material if likely relied upon by a reasonable prospective purchaser." F.T.C. v. Lanier Law, LLC , 194 F.Supp.3d 1238, 1274 (M.D. Fla. 2016) (citation omitted). Customers confirmed that they purchased claiming and verifying services, and the Citation Program, based upon the misrepresentations described herein. (See ECF Nos. 229-6 at ¶ 6, 229-7 at ¶¶ 4, 9-10, 229-8 at ¶¶ 4, 8-9, 229-10 at ¶¶ 4-5, 6-8, 229-11 at ¶ 4). Importantly, the FTC need only show that the representation had "a tendency to deceive," as "proof of actual consumer deception is unnecessary." Lanier Law, LLC , 194 F.Supp.3d at 1274.
1. Common Enterprise
The FTC asks this Court to hold Pointbreak liable for both its own conduct, and the conduct of Defendants Modern Source, Modern Spotlight, Modern Spotlight Group, Perfect Image, National Business Listings and DCP Marketing because these companies constitute a "common enterprise."[10] (ECF No. 228 at 16-17). Under the FTC Act, "a corporate entity can be held liable for the conduct of other entities where the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities." F.T.C. v. Lanier Law, LLC , 715 F. App'x at 979 (quotation marks and citation omitted). Factors that courts consider in determining the existence of a common enterprise include whether the businesses "share office spaces and employees, commingle funds, coordinate advertising efforts, and operate under common control." Id.
*1283 As an initial matter, Pillonato and Ramsey do not dispute, and thus concede, that Modern Source, Perfect Image, National Business Listings and DCP Marketing, along with Pointbreak, were a common enterprise. Importantly, the FTC has submitted sufficient evidence from which a jury could reasonably find that these entities are part of a common enterprise. Specifically, National Business Listings, DCP Marketing, Modern Source and Pointbreak shared common ownership, DCP Marketing and Pointbreak commingled funds, and Perfect Image, National Business Listings, DCP Marketing, Modern Source and Pointbreak used the same or similar robocall and/or live sales agent scripts. See supra at pp. 1276, 1277, 1278, 1279-80.
Pillonato's and Ramsey's sole challenge is to the FTC's assertion that Pointbreak was in a common enterprise with Modern Spotlight and Modern Spotlight Group. (ECF No. 234 at 2-4). They do so with a declaration from Michael Pocker, an owner of Modern Spotlight and Modern Spotlight Group, who asserts that these entities did not share offices, employees or bank accounts, nor were they under common control or coordinate advertising. (Id. at 2-3).
Pillonato and Ramsey take too narrow a view of a common enterprise. The FTC need not establish that all of the common enterprise factors were present. No one factor is determinative. Instead, courts must consider "the pattern and framework of the whole enterprise...." F.T.C. v. HES Merchant Services Co., Inc. , Case No. 6:12-cv-1618-Orl-22KRS, 2014 WL 6863506 at *5 (M.D. Fla. Nov. 18, 2014) (citation omitted). It is helpful to understand that the common enterprise "analysis is distinct from the alter ego inquiry, such that the entities formally may be separate corporations but operate as a common enterprise." Lanier Law, LLC , 194 F.Supp.3d at 1269.
Here, the evidence shows that Pointbreak and Modern Spotlight shared a credit card merchant account, and thereby commingled funds. See supra at p. 1278; Lanier Law , LLC, 715 F. App'x at 980 (common enterprise existed where, among other things, member of alleged common enterprise allowed other members "to access his accounts to process consumer payments"). Further, Modern Spotlight, Modern Spotlight Group and Pointbreak used similar robocall and live sales agent scripts, see supra at pp. 1276, 1277, and the principals of Pointbreak and the Modern Spotlight entities discussed scripts with one another. (ECF No. 229-111 at ¶ 15). In addition, Modern Spotlight Group hired former employees of Pointbreak, and occupied the former office space of Pointbreak. See supra at p. 1279. Modern Spotlight Group also used substantially similar consumer contracts and welcome emails as did Pointbreak and Pointbreak's successor company, Modern Source. See supra at p. 1279.
The record also shows that Modern Spotlight Group and Modern Source cooperated to induce customers to purchase their services. They shared client data, and Modern Spotlight Group sold its customer "leads" exclusively to Modern Source. (ECF No. 229-111 at ¶¶ 56, 58). Modern Spotlight Group set up appointments for customers to speak with Modern Source, and forwarded telephone calls to Modern Source. (Id. at ¶ 57). Modern Source sold its services only to customers of Modern Spotlight Group, and Ramsey acknowledged that Modern Source was entirely dependent upon Modern Spotlight Group for business. See supra at pp. 1279, 1280. "[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality - qualities that may be demonstrated by a showing of strongly interdependent economic interests *1284 or the pooling of assets and revenues." F.T.C. v. Network Services Depot, Inc. , 617 F.3d 1127, 1142-43 (9th Cir. 2010) (cited with approval by F.T.C. v. Direct Benefits Group, LLC , Case No. 6:11-cv-1186-Orl-28TBS, 2013 WL 3771322 at 18 (M.D. Fla. July 18, 2013) ). The evidence establishes this here.
In sum, the FTC has submitted sufficient evidence from which a jury could reasonably find that Pointbreak, Modern Spotlight and Modern Spotlight Group were a common enterprise, and Pillonato and Ramsey have not met their burden to demonstrate a genuine dispute regarding about this.
2. Individual Liability
This Court can hold Pillonato and Ramsey individually liable for the acts of Pointbreak and the other entities in the common enterprise if the FTC proves that they directly participated in or had the authority to control the deceptive practice and had "some knowledge" of the practice. F.T.C. v. Gem Merch. Corp. , 87 F.3d 466, 470 (11th Cir. 1996).
a. Control
The FTC "can prove that an individual defendant had control by showing that the individual controlled the day-to-day affairs of the operation." HES Merchant Services Co., Inc. , 2014 WL 6863506 at *6 (quotation marks and citation omitted). Pillonato and Ramsey do not dispute that they had the authority to control the entities (other than the Modern Spotlight entities) within the enterprise.[11] (See generally , ECF No. 234). The undisputed facts support this conclusion.
As already noted, Pillonato and Ramsey were actively involved in the business affairs of Pointbreak, Modern Source, National Business Listings and DCP Marketing. See supra at pp. 1279-81. Moreover, "[a]n individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." F.T.C. v. Transnet Wireless Corp. , 506 F.Supp.2d 1247, 1270 (S.D. Fla. 2007) (citation omitted). Pillonato and/or Ramsey were owners and officers of Pointbreak, Modern Source, National Business Listings and DCP Marketing, see supra at pp. 1279-80, and they have offered no evidence to rebut this presumption of control.
Instead, they argue that they did not control the common enterprise because they had no control over the Modern Spotlight entities. (ECF No. 234 at 3). Even if this were true, it would not relieve them of liability. As mentioned above, the undisputed facts establish that Pillonato and Ramsey controlled several other entities within the enterprise, namely Pointbreak, Modern Source, National Business Listings and DCP Marketing. Individuals who served as officers of some entities within common enterprise are deemed to have authority to control the entire enterprise. See F.T.C. v. Tax Club, Inc. , 994 F.Supp.2d 461, 473 (S.D.N.Y. 2014).
b. Knowledge
A defendant may be found individually liable if he exhibits "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." Lanier Law, LLC , 194 F.Supp.3d at 1286 (citations omitted). Pillonato and Ramsey challenge this element by arguing that they were not recklessly indifferent. (ECF No. 234 at 4-5). They rely on testimony of a co-owner of *1285 Pointbreak that Pillonato "was a real stickler for making the distinction...that we were not Google" and both directed that employees be terminated if they led customers to believe that they would be removed from Google or acted as if Pointbreak was Google. (ECF No. 234 at ¶ 3). In the context of the record as a whole, this amounts to a "mere scintilla of evidence," and it is well-established that the non-moving party must do more to create a genuine dispute of material fact. See Fedolfi v. Banyan Air Services, Inc. , 258 Fed. Appx. 274, 276 (11th Cir. 2007) (citations omitted).
The undisputed facts establish that Pillonato and Ramsey certainly had "some knowledge" of Pointbreak's deceptive practices. See Gem Merch. Corp. , 87 F.3d at 470. Both were involved in drafting the deceptive robocall and live sales agent scripts. See supra at pp. 1279-80. They also monitored customers' negative reviews and credit card chargebacks. See supra at pp. 1279-81. Pillonato even described their chargeback rate as "horrible" and admitted that customers "saw 0 benefits" and "got 0 results." See supra at pp. 1279-80. This is clear evidence that Pillonato and Ramsey knew or, at the very least, were recklessly indifferent to the deceptive content of Pointbreak's robocalls and live sales agent calls. See e.g. , Direct Benefits Group, LLC , 2013 WL 3771322 at *20 (individuals knew of the probability and fact of deception because they created the contents of deceptive websites); F.T.C. v. MacGregor , 360 F. App'x 891, 894-95 (9th Cir. 2009) (individual defendant "likely knew of material misrepresentations...or was at least recklessly indifferent to the truth" given "evidence showing the high volume of consumer complaints, [and] the high refund and return rates...").
Pillonato and Ramsey also had knowledge of the deceptive practices used by other entities within the common enterprise. For example, National Business Listing used the same deceptive script as Pointbreak, and Pillonato was aware of the chargebacks that it received. See supra at pp. 1279, 1280. Both Pillonato and Ramsey knew the content of the deceptive robocalls that the Modern Spotlight entities used, id. at 1279-80, and Ramsey discussed the content of those scripts with the owner of the Modern Spotlight entities. (ECF No. 229-111 at ¶ 15).
For the foregoing reasons, there is no genuine dispute of material fact that Pillonato and Ramsey are individually liable for the conduct of the common enterprise, and the FTC is entitled to judgment as a matter of law against them on Count I.
C. The FTC is Entitled to Summary Judgment on Count II
In Count II of the Amended Complaint, the FTC contends that Pointbreak engaged in unfair billing practices in violation of Section 5(a) of the FTC Act, and asks this Court to hold Pillonato and Ramsey liable for that conduct. (ECF No. 109 at 35). "An unfair practice under ¶ 5(a) is one that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." Direct Benefits Group, LLC , 2013 WL 3771322 at *13 (citation omitted). A substantial injury is an unfair practice that causes small harm to a large class of people. Orkin Exterminating Co., Inc. v. F.T.C. , 849 F.2d 1354, 1365 (11th Cir. 1988) (citations omitted); F.T.C. v. Windward Marketing, Inc. , No. Civ.-A. 1:96-CV-615F, 1997 WL 33642380 at *11 (N.D. Ga. Sept. 30, 1997). Consumers can reasonably avoid injury if they "had a free and informed choice that would have enabled them to avoid the unfair practice."
*1286 Windward Marketing, Inc. , 1997 WL 33642380, at *11 (citations omitted). Finally, the unfairness of the practice is not outweighed when it "produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition...." Id.
It is undisputed that after Bank of America terminated Pointbreak's credit card merchant account, Pointbreak wrote itself $ 100 checks from 280 customers' bank accounts without those customers' knowledge or authorization and without providing any increased services or benefits in return. See supra at p. 1278. This is an unfair billing practice punishable under Section 5(a) of the FTC Act. Pillonato and Ramsey make no argument to the contrary, and do not dispute their personal liability for Pointbreak's unfair billing practice. The FTC's evidence supports Pillonato's and Ramsey's concession. As already discussed, both had authority to control Pointbreak. Both also directly participated in and knew about Pointbreak's unfair billing practice, as Ramsey endorsed all the unauthorized $ 100 checks with Pillonato's knowledge and both knew that the unauthorized checks were deposited in Pointbreak's bank accounts. See supra at pp. 1280-81. Accordingly, the FTC is entitled to judgment as a matter of law against Pillonato and Ramsey on Count II.
D. The FTC is Entitled to Summary Judgment on Counts III and IV
In Counts III and IV, the FTC sues Pillonato and Ramsey for violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b). These claims arise from the robocalls Pointbreak made, which include millions of calls to telephone numbers on the National Do Not Call Registry. (ECF No. 109 at 35-37). A violation of the TSR is an unfair or deceptive practice under Section 5(a) of the FTC Act. See 15 U.S.C. §§ 6102(c), 6105(b) ; see also F.T.C. v. WV Universal Management, LLC , 877 F.3d 1234, 1240 (11th Cir. 2017) ("[B]y violating the TSR, [defendant] violated the FTC Act and is subject to its penalties."). With limited exceptions not present here, the TSR prohibits telemarketers from initiating, and sellers from causing telemarketers to initiate, "any outbound telephone call that delivers a prerecorded message" and "any outbound telephone call to a person when...[t]hat person's telephone number is on the 'do-not-call' registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services...." 16 C.F.R. § 310.4(b)(1)(iii)(B), (v).
The TSR defines a telemarketer as "any person who...initiates or receives telephone calls to or from a customer..." and a seller as "any person...who provides...goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd), (ff). Pillonato and Ramsey do not dispute that Pointbreak was a telemarketer and a seller within the meaning of the TSR. (ECF No. 234). They also do not dispute that Pointbreak, with their knowledge, initiated robocalls, including robocalls to telephone numbers on the National Do Not Call Registry. (Id. ). Indeed, the evidence shows that over a seven-week period, Pointbreak made nearly 15 million telephone calls to telephone numbers on the National Do Not Call Registry. See supra at p. 1276. The evidence also shows that Pillonato and Ramsey provided the telephone numbers used for robocalls and by sales agents, that they were aware of the high volume of robocalls and that many telephone calls reached non-business and telephone numbers on the National Do Not Call Registry. See supra at pp. 1279-80. Based upon the foregoing, Pillonato *1287 and Ramsey are individually liable for violation of the TSR and, thus, Section 5(a) of the FTC Act.
The only argument that Pillonato and Ramsey make in opposition is that Pointbreak's calls are exempted from the TSR under the business-to-business exception. The TSR exempts "[t]elephone calls between a telemarketer and any business to induce the purchase of goods or services...." 16 C.F.R. § 310.6(b)(7). Pillonato and Ramsey assert that "[i]f a non-business received calls such numbers were called in error likely due to the reassignment from a business line to a non-business line." (ECF No. 234 at 6). They offer no evidence to support their assumption. "[U]nsupported speculation ... does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Cordoba v. Dillard's, Inc. , 419 F.3d 1169, 1181 (11th Cir.2005) (citation omitted).
Even if their assertion were supported by evidence, it would be insufficient for a jury to reasonably conclude that the TSR's business-to-business exception applies. Notably, another district court squarely rejected the argument Pillonato and Ramsey make here. In F.T.C. v. Inc21.com Corp. , the defendants argued that the business-to-business exception "must extend to any telelemarking call intended to be made to a business." Inc21.com Corp. , 745 F.Supp.2d 975, 1007 (N.D. Cal. 2010) (emphasis in original). The court disagreed, reasoning that "the plain language of the TSR clearly and unambiguously states that the 'business-to-business' exemption applies solely to 'telephone calls' between telemarketers and businesses. Nowhere in this language are the subjective intentions of telemarketers referenced." Id. at 1007.
For the foregoing reasons, the FTC is entitled to judgment as a matter of law against Pillonato and Ramsey on Counts III and IV.
E. Entry of a Permanent Injunction and Money Judgment is Warranted
The FTC asks this Court to enter a permanent injunction, and equitable money judgment in the amount of $ 3,367,666.30, against Pillonato and Ramsey. (ECF Nos. 228 at 24-25, 241 at 1 n.1). Section13(b) of the FTC Act provides that "after proper proof, the court may issue a permanent injunction."[12] 15 U.S.C. § 53(b). The Eleventh Circuit interprets Section 13(b) as "an unqualified grant of statutory authority to issue the full range of equitable remedies, including disgorgement, which considers only the defendants' unjust gain and ignores consumer loss." F.T.C. v. Washington Data Resources, Inc. , 704 F.3d 1323, 1326 (11th Cir. 2013). "To calculate the size of the award, the FTC must first show that its calculations reasonably approximate the amount of the defendants' unjust gains, after which the burden shifts to the defendants to show that those figures are inaccurate." Lanier Law, LLC , 194 F.Supp.3d at 1288 (citations omitted). The Eleventh Circuit has held that "the amount of net revenue (gross receipts minus refunds)...is the correct measure of unjust gains under section 13(b)." Washington Data Resources, Inc. at 1327.
*1288 The FTC is entitled to equitable monetary relief. The FTC has provided evidence that the Pointbreak Defendants' net revenues, calculated as gross revenues less chargebacks and refunds, during the relevant time period, total $ 3,367,666.30.[13] (ECF No. 229-106 at Table 2, ¶ 19). Pillonato and Ramsey do not dispute the FTC's calculation, and it is their burden to do so. (ECF No. 234 at ¶ 6). In fact, they offer no objection to entry of a money judgment. The Court has carefully reviewed the FTC's calculation and finds that it represents a reasonable approximation of the Pointbreak Defendants' net revenues.
The FTC asks the Court to hold Pillonato and Ramsey jointly and severally liable. (ECF No. 228 at 24, 241-1 at 7). This record, that Pillonato and Ramsey were jointly responsible for the acts of the common enterprise, supports their joint and several liability. See supra at pp. 1284-86; F.T.C. v. Life Management Services of Orange County, LLC, et al. , 350 F.Supp.3d 1246, 1259-60 (M.D. Fla. 2018) (defendants engaged in common enterprise can be held jointly and severally liable for the acts of each member). The Court finds that the FTC is entitled to a monetary judgment against Pillonato and Ramsey, jointly and severally, in the amount of $ 3,367,66.30.
The FTC argues that Pillonato and Ramsey are likely to continue to violate the FTC Act and TSR, and it therefore requests entry of a permanent injunction to protect consumers going forward. (ECF No. 228 at 24-25). A permanent injunction is permissible even if a defendant has ceased his unlawful conduct if "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." F.T.C. v. USA Financial, LLC, et al. , 415 F. App'x. 970, 975 (11th Cir. 2011) (citation omitted). In determining whether a defendant is likely to commit future violations, courts consider the following factors: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations...." Lanier Law, LLC , 194 F.Supp.3d at 1288 (citations omitted). The application of these factors to this record support entry of a permanent injunction, as necessary to protect the public and prevent future violations. Significantly, Ramsey and Pillonato engaged in these unlawful practices when they were subject to permanent injunctions that prohibited this very same misconduct. See supra at p. 1280.
The FTC submitted a proposed permanent injunction with its Motion for Summary Judgment and Reply.[14] (ECF Nos. 228-1, 241-1). The proposed injunction includes "fencing-in" provisions. "[C]ourts may impose 'fencing-in' provisions, which extend beyond the specific violations at issue, to prevent defendants from engaging in similar deceptive practices in the *1289 future, so long as they bear a reasonable relation to the unlawful practices found to exist." Lanier Law, LLC , 194 F.Supp.3d at 1288-89 (quotation marks and citations omitted). The FTC does not identify which provisions in its proposed permanent injunction are "fencing-in" provisions. However, the Court has carefully reviewed the proposed permanent injunction and notes that several provisions address conduct beyond the wrongdoing for which the Court is holding Pillonato and Ramsey liable. (See e.g. , ECF No. 241-1 at IV (Prohibition Against Misrepresentations), VIII (Compliance Reporting), IX (Recordkeeping) ). The Court finds that the provisions in the proposed permanent injunction reasonably relate to the unlawful practices Pillonato and Ramsey engaged in and, thus, are appropriate "fencing-in" relief.
Pillonato and Ramsey do not object to any provision in the proposed permanent injunction except for the provision requiring them to transfer possession, custody and control to the Receiver of 53 items of jewelry. (ECF No. 234 at ¶ 6). Pillonato and Ramsey assert, without any supporting evidence, that they do not have possession of that jewelry. (Id. ). The FTC has submitted evidence of Ramsey's purchase of all 53 items of jewelry. (ECF No. 241-3). Ramsey does not deny this in his opposition. To defeat summary judgment, the non-moving party must submit evidence from which a reasonable jury can find in his favor. Pillonato and Ramsey have not done this.
For the reasons set forth above, entry of a permanent injunction and money judgment in the amount of $ 3,367,666.30 against Ramsey and Pillonato, jointly and severally, is warranted. I respectfully recommend that the Court enter the Final Order of Permanent Injunction and Monetary Judgment attached hereto.[15]
III. CONCLUSION AND RECOMMENDATION
For the foregoing reasons, the Court concludes that the FTC is entitled to judgment as a matter of law against Defendants Pillonato and Ramsey on all claims brought against them in the Amended Complaint. The Court also concludes that the FTC is entitled to a permanent injunction in the form attached hereto, and a money judgment against Pillonato and Ramsey, jointly and severally, in the amount of $ 3,367,666.30 .
Accordingly, I RESPECTFULLY RECOMMEND that the Court GRANT the FTC's Motion for Summary Judgment Against Defendants Dustin Pillonato and Justin Ramsey (ECF No. 228). I FURTHER RECOMMEND that the Court enter the attached Final Order of Permanent Injunction and Monetary Judgment As to Defendants Dustin Pillonato and Justin Ramsey.
No later than seven (7) days from the date of this Report and Recommendation the parties may file any written objections to this Report and Recommendation with the Honorable Cecilia M. Altonaga, who is obligated to make a de novo review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. See *1290 Thomas v. Arn , 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), Henley v.Johnson , 885 F.2d 790, 794 (11th Cir. 1989), 28 U.S.C. § 636(b)(1), 11th Cir. R. 3-1 (2016). The opposing party may file a written response within seven (7) days from the date any objections are filed.[16]
RESPECTFULLY SUBMITTED in chambers at Miami, Florida, this 11th day of March, 2019.

A clerk's default was previously entered against Pointbreak, Modern Source, DCP Marketing, National Business Listings and Allstar Data. (ECF Nos. 97-99, 156-57).

This is filed at ECF No. 229.

Rule 56 provides that "[a] party may object that the material cited to support...a fact cannot be presented in a form that would be admissible at trial." Pillonato and Ramsey have not made this objection. Nonetheless, the Court affirmatively finds that the supporting evidence the FTC submitted would be admissible at trial and, thus, the Court can rely upon it at the summary judgment stage. Much of the evidence the FTC cites is witness declarations, and the Court finds that the content of those declarations could be made admissible evidence at trial. See Federal Trade Commission v. Lanier Law LLC , 715 F. App'x. 970, 979 (11th Cir. 2017) ( [T]he appropriate question [at summary judgment] is not whether the declarations themselves would ever be admissible - they may not be. Instead, the question is whether the evidence contained within those declarations could be presented in admissible form at trial.") (emphasis in original).

Ramsey and Pillonato are on notice of this obligation. The Court previously ordered them to comply with the Federal Rules of Civil Procedure and Local Rules for the Southern District of Florida. (ECF No. 199, Order Providing Instructions to Pro Se Litigants , at 1).

Local Rule 56.1 for the Northern District of Georgia is similar in all material respects to Local Rule 56.1 for the Southern District of Florida.

An exception to this rule exists if the claimant is also a defendant in a criminal case. Id. There is no evidence that Pillonato or Ramsey are defendants in a criminal case.

For that matter, Google was not associated with any of the entities involved in this scheme. (ECF No. 229-104 at 14-30).

Pointbreak did not regularly charge $ 100 for its services. (ECF No. 22, SUMF, at ¶ 33). Indeed, prior to this time, only 0.5% of Pointbreak's 7,483 credit card transactions were for $ 100.00. (ECF No. 229-106 at ¶ 25).

A poor credit card chargeback rate is, at minimum, a sign of customer dissatisfaction, and can be a marker of fraud.

As explained in the following section, the FTC next asks the Court to find Pillonato and Ramsey individually liable for the deceptive practices of the common enterprise.

In their Opposition, Pillonato and Ramsey also do not dispute that they directly participated in the deceptive acts of the common enterprise. (See generally , ECF No. 234).

The FTC Act also provides that the court has "jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from...the unfair or deceptive act or practice, as the case may be." 15 U.S.C. § 57b.

During the relevant time period, the net revenues of the Pointbreak Defendants were as follows: (i) Pointbreak Media $ 2,259,398.62, (ii) Modern Spotlight Group $ 635,359.79, (iii) Modern Source $ 232,077.69, (iv) Perfect Image $ 79,601.18, (v) DCP Marketing $ 92,272.19 and (vi) National Business Listings $ 68,956.83. (ECF No. 229-106 at Tables 2 & 4, ¶ 19).

The proposed injunction attached to the Reply is identical to the version attached to the FTC's motion for summary judgment, except for the amount of monetary relief requested.

The attached Final Order of Permanent Injunction and Monetary Judgement is substantially similar to the FTC's proposal, which is attached to its Reply. (ECF No. 241-1). The only differences are in the following sections, which I revised for clarity, accuracy and/or stylistic reasons: (i) FINDINGS at ¶¶ D, E, F, H, O, P, Q, (ii) V (MONETARY JUDGMENT) at ¶ G, (iii) VI., (CUSTOMER INFORMATION), (iv) VII., (ORDER ACKNOWLEDGMENTS) and (v) VIII. (COMPLIANCE REPORTING) at ¶ 1.

The Court shortens the deadline to file objections and any corresponding response to accommodate the upcoming calendar call and trial.